## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:12-cv-00230-MR-DLH

| | | |
|---|---|---|
| LAWRENCE BARD and LOUISE BARD, | ) ) ) | |
| Plaintiffs, | ) ) | **MEMORANDUM OF** |
| vs. | ) ) | **DECISION AND ORDER** |
| BANK OF AMERICA, N.A., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for

Summary Judgment [Doc. 44].

## I.    PROCEDURAL BACKGROUND

This action arises from the Plaintiffs' purchase of Lot 135 and Lot 143

(the "Lots") in Grey Rock at Lake Lure ("Grey Rock"), a planned resort

community in North Carolina.  After meeting with Grey Rock's developer,

LR Buffalo Creek, LLC (together with its parent company Land Resource,

LLC, "Land Resource") and picking their Lots, the Plaintiffs turned to Bank

of America to finance their purchase.  Land Resource failed to complete the

infrastructure and amenities in Grey Rock and subsequently became

insolvent, leaving the Plaintiffs owning land with a value significantly lower

than the original purchase price. The Plaintiffs now bring this action against Bank of America, seeking to hold their lender legally responsible for their losses.

The Plaintiffs initially brought suit in one mass action with other borrower-plaintiffs on December 8, 2011, but the Court severed all claims. Carter v. Bank of America, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011). The Plaintiffs then refiled an individual Complaint. Following the Court's Order granting in part and denying in part Bank of America's Motion to Dismiss, only Plaintiffs' claims for fraud and for violations of the Interstate Land Sales Act ("ILSA") and the North Carolina Unfair and Deceptive Trade Practices Act ("Chapter 75") remain.

Bank of America now seeks summary judgment on the Plaintiffs' remaining claims. For the reasons that follow, the Bank's motion will be granted.

## II.    STANDARD OF REVIEW

In reviewing a party's motion for summary judgment, this Court is mindful that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the case."   N&O Pub. Co. v. RDU Airport

Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists. Id. Finally, in considering the motion for summary judgment filed by the defendant, the Court must view the pleadings and materials presented in the light most favorable to the plaintiff as the non-movant and must draw all reasonable inferences in the plaintiff's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.  FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiffs, the following is a summary of the relevant facts.

The Bards own several heavily-mortgaged investment properties, and had bought and sold undeveloped land prior to purchasing at Grey Rock. [Doc. 44-3, Deposition of Lawrence Bard ("Lawrence Bard Dep.") at 18, 19, 22-23; Doc. 44-4, Bard Responses to Interrogatories at ¶7]. The Bards own three lots at Grey Rock: the two at issue in this lawsuit and a third that they purchased by refinancing a rental property after Bank of America declined to finance an additional loan. [Id.].

The Plaintiffs first heard about Grey Rock through a USA Today advertisement they saw in March 2005 when travelling through the Carolinas. [Doc. 44-3, Lawrence Bard Dep. at 30, 31-32]. The next day, they went to the Land Resource sales office to learn more about the property. [Id.]. A Land Resource sales agent gave the Bards a "typical agent pitch about the development," emphasizing the amenities like the clubhouse, boathouse, and stables, and then Mr. Bard accompanied the agent for a three-hour visit to the site. [Id. at 33-34]. Ms. Bard did not visit the site itself, but testified that it "appeared very lovely" and "appeared to be what we were looking for." [Doc. 44-5, Deposition of Louise Bard ("Louise Bard Dep.") at 17, 18]. When the Plaintiffs returned to their hotel that night, their discussion focused on whether to "just buy the one lot" or to buy additional lots. [Doc. 44-3, Lawrence Bard Dep. at 36-37].

The next day, March 6, 2005, the Plaintiffs returned to the Land Resource sales office and signed a Purchase Agreement. [Doc. 44-4, Plaintiffs' Responses to First Set of Interrogatories at ¶5; Doc. 44-3, Lawrence Bard Dep. at 37]. Under the Purchase Agreement, the Bards agreed to purchase Lot 135 for $129,900. [Doc. 44-6, Purchase Agreement]. The Bards also purchased Lot 143 that day for $119,900. [Doc. 44-3, Lawrence Bard Dep. at 43-44]. Bank of America is not mentioned in the Purchase Agreement, is not a signatory to the Purchase Agreement, and no one from Bank of America was present when the Bards signed the Purchase Agreement. [Doc. 44-7, Plaintiffs' Responses to First Requests for Admission at ¶8; Doc. 44-4, Plaintiffs' Responses to First Set of Interrogatories at ¶5; Doc. 44-3, Lawrence Bard Dep. at 38]. The Plaintiffs were so impressed by Grey Rock that they also purchased two $1,000 certificates that allowed them to purchase additional future lots. [Doc. 44-3, Lawrence Bard Dep. at 37].

The Plaintiffs admit that, prior to entering into the Purchase Agreement, they did not obtain an appraisal of the Lots, do online research, or do anything else aside from visiting the site with the sales agent to investigate the value of the Lots. [Doc. 44-7, Plaintiffs' Responses to First Requests for Admission at ¶4; Doc. 44-3, Lawrence Bard Dep. at 45; Doc.

44-5, Louise Bard Dep. at 19].   Indeed, they had "never heard of Land Resource" before they signed the Purchase Agreement.   [Doc. 44-3, Lawrence Bard Dep. at 62].

The weekend the Bards visited Grey Rock, Land Resource gave them contact information for Bank of America loan officer Mindy Johnson, and for a loan officer with SunTrust Bank.  [Doc. 44-3, Lawrence Bard Dep. at 35, 54-55].  Ms. Bard did not speak with anyone from Bank of America prior to purchasing the Lots, and Mr. Bard was not clear on whether he spoke with Ms. Johnson or anyone from the Bank before signing the Purchase Agreement.  [Doc. 44-5, Louise Bard Dep. at 22–23; Doc. 44-3, Lawrence Bard Dep. at 35–36, 41, 61].  Similarly, the Plaintiffs did not receive anything from Bank of America in writing or attend any marketing events hosted by Bank of America prior to signing the Purchase Agreement.  [Doc. 44-3, Lawrence Bard Dep. at 49–50].

Mr. Bard contacted Johnson at some point early in the process. [Doc. 44-3, Lawrence Bard Dep. at 35-36, 41, 61].  Johnson told him that she had done a lot of mortgages at Grey Rock, that Land Resource was a reputable developer, and that she wished that she could buy at Grey Rock. [Id. at 61, 62].  Johnson also told him that owners were making money by

turning over lots, which Mr. Bard acknowledged had occurred, and that Grey Rock was a good investment.  [Id. at 65, 66].

Johnson told the Bards that an interest-only five-year term adjustable rate loan with no documentation was available from Bank of America; that buying property in North Carolina was a good value; that Grey Rock was a good place for a retirement home; that the Bards were getting in on the ground floor of a great project and benefitting from pre-development incentives and discounts and that they were not overpaying for their lot; that the developer had plans in place to construct infrastructure and would be moving quickly; that lot prices were reduced in Phase 1 as an incentive to purchase which gave buyers built-in equity to incentivize them to buy as it was a very attractive deal and a nice investment opportunity; that HGTV[1] would not stake its reputation twice on a developer if it was not a developer of fine community; that if they did not buy in Grey Rock now, prices would go up and the Bards would pay significantly more for their lots; and that they would pay top dollar to get into an established community so that it

---

[1] Every year since 1997, Home & Garden Television has produced a television show entitled "HGTV Dream Home," which chronicles the construction of a luxury home which is then given away in a sweepstakes.  Grey Rock was selected to be the site of an HGTV Dream Home, and construction was actually completed on the structure in 2006. See generally  www.hgtv.com/design/hgtv-dream-home  (last visited November 12, 2014).

was much smarter to get into a great new community before prices escalated. [Doc. 46-4, Plaintiffs' Responses to Interrogatories; Doc. 46-5, Plaintiffs' Verifications; Doc. 46-6, Plaintiffs' Rule 26 Initial Disclosures at 3-5]. Johnson also told Mr. Bard that the properties that the Bards were purchasing had appraised at or near the purchase price. [Doc. 46-2, Bard Dep. at 76].

On or about April 4, 2005, Mr. Bard executed a note in the amount of $123,405 for the purchase of Lot 135, and Ms. Bard executed a note for $113,905 for the purchase of Lot 143. [Doc. 44-8, Lot 135 Note; Doc. 44-9, Lot 143 Note]. Both notes were secured by deeds of trust. [Docs. 44-10 and 44-11, Lot 135 Deed of Trust; Doc. 44-12, Lot 143 Deed of Trust (collectively, the "Mortgages")].

The Plaintiffs did not engage Bank of America to provide them with investment advice, and Mr. Bard testified that if another lender would have offered a better rate than Bank of America, he probably would have used that lender. [Doc. 44-3, Lawrence Bard Dep. at 59, 61]. The Plaintiffs did not see appraisals of the Lots prior to closing on their loans. [Id. at 75]. At no point did Bank of America prevent or discourage the Plaintiffs from returning to Grey Rock or hiring an appraiser prior to closing to further

investigate the Lots. [Doc. 44-7, Plaintiffs' Responses to First Requests for Admission at ¶20; Doc. 44-3, Lawrence Bard Dep. at 74–75].

In 2006, after purchasing Lots 135 and Lot 143, the Bards purchased another Grey Rock property, Lot 98. [Doc. 44-3, Lawrence Bard Dep. at 79]. The Bards reached out to both Bank of America and SunTrust Bank for a loan to purchase Lot 98, but neither would provide financing, telling Mr. Bard that "they were not making lot loans." [Id. at 81]. This did not discourage the Bards from purchasing another lot at Grey Rock; rather, they refinanced a property they owned in Kissimmee, Florida to obtain funds to purchase Lot 98. [Id. at 81].

The Bards eventually became dissatisfied with their investment. In 2007, Mr. Bard visited Grey Rock and was dissatisfied with the state of Lot 135 and complained to a Land Resource sales manager. [Doc. 44-3, Lawrence Bard Dep. at 83-85]. In March 2008, the Bards stopped paying their Mortgages because they discovered that Grey Rock "was not going to be completed, that the project was in default, [and] the property value was not [commensurate] with the loan amount." [Id. at 78].

As a result, Plaintiffs contacted an attorney regarding their issues with the Lots and eventually decided to sue Land Resource in August 2008. [Id. at 52; see Goetz v. Land Resource, No. 6:08-cv-1471 (M.D. Fl. filed Aug.

26, 2008)]. On May 11, 2009, Mr. Bard suggested to the Bank that they "both go after the developer" as both parties were out the cost of the investment. [Doc. 44-13, May 11, 2009 Letter].

As previously noted, the Plaintiffs initiated the present suit as part of a mass action with other borrower-plaintiffs on December 8, 2011. <u>Carter v. Bank of America</u>, Civil Case No. 1:11-cv-00326 (W.D.N.C. Dec. 8, 2011).

## IV. DISCUSSION

### A. Statute of Limitations

In the present case, the Plaintiffs assert claims for fraud, violations of Chapter 75, and violations of ILSA. Under North Carolina law, the statute of limitations applicable to fraud claims is three years. <u>See</u> N.C. Gen. Stat. § 1-52(9). This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence." <u>Hunter v. Guardian Life Ins. Co.</u>, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, <u>disc. rev. denied</u>, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations. <u>See</u> N.C. Gen. Stat. § 75-16.2. While a Chapter 75 claim generally accrues when the violation of the statute occurs, <u>see</u> <u>Jones v. Asheville Radiological Group, PA</u>, 134 N.C. App. 520, 527, 518 S.E.2d 528,

533 (1999), rev'd in part on other grounds, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence.  See, e.g., Faircloth v. Nat'l Home Loan Corp., 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), aff'd, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. See 15 U.S.C. § 1711.  The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted.  For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[2], the statute of limitations expires "three years after discovery of the violation or after

_____

[2] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

    (A) to employ any device, scheme, or artifice to defraud;

    (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]

    (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

discovery should have been made by the exercise of reasonable diligence."

15 U.S.C. § 1711(a)(2).  The statute of limitations for an alleged violation of

§ 1702(a)(2)(D)[3] expires three years after the date of signing of the contract

of sale.  See 15 U.S.C. § 1711(a)(1).  This limitations period, however, may

be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they

exercised due diligence to discover their cause of action before the

limitations period ran; and (2) that the defendant committed an affirmative

act of fraudulent concealment to frustrate discovery despite due diligence."

Orsi v. Kirkwood, 999 F.2d 86, 89 (4th Cir. 1993); Lukenas v. Bryce's

Mountain Resorts, Inc., 538 F.2d 594, 597 (4th Cir. 1976); Dexter v. Lake

Creek Corp., No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May

7, 2013).

Generally, under North Carolina law, the issue of "when fraud should

be discovered in the exercise of reasonable diligence is a question of fact

for the jury."  State Farm Fire and Cas. Co. v. Darsie, 161 N.C. App. 542,

548 S.E.2d 391, 397 (2003).  Where, however, "the evidence is clear and

---

[3] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed."  15 U.S.C. § 1703(a)(2)(D).

shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law." <u>Drinkard v. Walnut Street Sec., Inc.,</u> No. 3:09-cv-66-FDW, 2009 WL 1322591, at *2 (W.D.N.C. May 11, 2009) (citation omitted).

Here, viewing the forecast of evidence in the light most favorable to the Plaintiffs, the Court concludes that the undisputed forecast of evidence demonstrates that the Plaintiffs' claims are time barred. The Plaintiffs claim that they were induced to purchase their property through aggressive sales tactics and misrepresentations regarding luxury amenities and development infrastructure. The Plaintiffs were clearly aware of such facts, however, at the time they initiated their lawsuit against the developer in August 2008, as that lawsuit also involves allegations that they were induced to purchase the same property through aggressive sales tactics and misrepresentations regarding the status of the development. At the very least, then, the Plaintiffs' ILSA and fraud claims were barred on or before August 26, 2011, months before the Plaintiffs filed the present lawsuit against the Bank.

The Plaintiffs contend that their knowledge of wrongdoing on the part of the *Developer* does not equate to knowledge of the *Bank's* involvement

in the alleged fraud.  Even assuming that this is true, however, the Plaintiffs have failed to establish that they acted with reasonable diligence to discover the underlying facts supporting any of their claims against the Bank prior to the expiration of the applicable statutes of limitation.  The Plaintiffs executed the Purchase Agreement for the Lots on March 6, 2005 and took possession of their Lots upon closing on April 4, 2005, yet they waited over six years to initiate this action.  The Plaintiffs have failed to present a forecast of evidence that they did *anything* in this interim period to discover their causes of action against the Bank, nor have they shown that the Bank committed any affirmative act of fraudulent concealment to frustrate discovery despite their due diligence.

For all of these reasons, the Court concludes that the Plaintiffs' claims are time-barred.

**B.    ILSA Claim**

Even assuming that the Plaintiffs' claims are not time-barred, the Plaintiffs' claims under the ILSA are also subject to dismissal because the Plaintiffs have failed to present a forecast of evidence that Bank of America is a "developer" or "agent" within the meaning of the Act or that Bank of America engaged in a scheme to defraud the Plaintiffs during the lot purchase.

14

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976). "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA. See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92

(S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA." Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers.

Hammar, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." In re Total Realty Mgmt., LLC, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was

alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Here, the undisputed forecast of evidence demonstrates that the Bank was not a co-developer with or agent of Land Resource. Bank of America provided no funding for the Grey Rock development. [Doc. 44-14, Affidavit of Jonathan Rainey ("Rainey Aff.") at ¶ 5]. Further, Bank of America did not sell the lots to the Plaintiffs and was not a party to the Purchase Agreement. Indeed, the Plaintiffs have presented no forecast of evidence tending to show that they had any contact with a Bank representative before signing their Purchase Agreement.

To the extent that the Plaintiffs contend that the Bank engaged in marketing activities on behalf of the developer, the Plaintiffs have failed to present a forecast of evidence that the alleged representations went beyond the ordinary course of dealing with a bank selling loan products to interested customers. In fact, the Plaintiffs have not presented any forecast of evidence that Bank of America engaged in any marketing of *Grey Rock*, as opposed to the loan products it offered to Grey Rock purchasers.

The Plaintiffs also argue that because they never received a HUD property report from Land Resource, as required by the ILSA, they had the

right to rescind the Purchase Agreement. The Plaintiffs contend that Johnson's alleged misrepresentations somehow prevented them from subsequently rescinding their Purchase Agreement within the statutory two-year period. See 15 U.S.C. § 1703(c). Notably, the Plaintiffs do not allege such a claim in their Complaint regarding a violation of the ILSA, 15 U.S.C. § 1703(a)(1)(B). Notwithstanding such argument, however, the Plaintiffs have not presented any forecast of evidence that the Bank was aware that the Plaintiffs had not received a Property Report or that it misrepresented any material facts in order to induce the Plaintiffs to refrain from rescinding the purchase agreement on this basis. In any event, this argument is belied by the Purchase Agreement itself, wherein the Plaintiffs specifically certified that they had received copies of the Property Report. Accordingly, to the extent that the Plaintiffs attempt to argue that the Bank induced them to forego a statutory right to revoke the Purchase Agreement, this argument fails.

For all of these reasons, the Court concludes that the Bank was not a "developer" or "agent" of Grey Rock within the meaning of the ILSA. Accordingly, the Plaintiffs' claims under the ILSA are dismissed.

### C.    Fraud Claim

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party.  Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007).  Additionally, the party must demonstrate any reliance on the false representations was reasonable.  See id.  "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate."  Cobb v. Penn. Life Ins. Co., 215 N.C. App. 268, 277, 715 S.E.2d 541, 549 (2011).

The conversations the Plaintiffs had with Johnson in the course of securing financing for their lot purchase do not support a claim of fraud. First, most of Johnson's representations amount to nothing more than expressions of opinions regarding the value or quality of the property as a potential investment.  "A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud."  Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984).  North Carolina law recognizes an exception to the general rule that statements of opinion are not actionable

"if, at the time [the statement of opinion] is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwich v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Plaintiffs, however, have failed to present a forecast of evidence that Johnson made any of the aforementioned statements while holding a contrary opinion.

To the extent that the Plaintiffs claim to have been misled by Johnson's representations regarding the high demand for Grey Rock lots, the Plaintiffs have failed to present a forecast of evidence that such statements were actually false. Furthermore, to the extent that the Plaintiffs claim to have been misled by Johnson's representations that the lot would increase in value over time and that they would be able to re-sell their lot before the loan period expired, such representations "'are not regarded as fraudulent in law,' since they are not misrepresentations of a 'subsisting fact.'" Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985) (citation omitted).

Even if any of Johnson's statements were actionable, no reasonable fact-finder could infer from the forecast of evidence presented that the Plaintiffs actually relied upon these opinions. The Plaintiffs already had

entered into the purchase agreement for the property when they had the conversations with Johnson in which she supposedly made the alleged misrepresentations. Thus, they were already committed to purchasing the lot when Johnson made the alleged misrepresentations. For these reasons, the Court concludes as a matter of law that Johnson's statements could not have been the cause of the Plaintiffs' harm. See Carty v. Westport Homes of N.C., Inc., 472 F. App'x 255, 259 (4th Cir. 2012) (citing Shortridge v. Platis, 458 N.E.2d 301, 304 (Ind. Ct. App. 1984) ("There can be no recovery in fraud for a deception by which a person is induced to do something which he is already bound to do.").

Even if reliance by the Plaintiffs could be shown, however, such reliance was unreasonable as a matter of law. "North Carolina courts consistently have held that exaggerated representations by a seller as to property's value are mere 'puffery' on which a buyer is not entitled to rely." Stephen Dilger, Inc. v. Meads, No. 5:11–CV–42–FL, 2011 WL 1882512, at *7 (E.D.N.C. May 17, 2011) (citing Horton v. Humble Oil & Refining Co., 255 N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement of opinion go for nothing. One who relies on such affirmations made by a person whose interest might prompt him to invest the property with exaggerated value does so at his peril, and must

take the consequences of his own imprudence.")).  Since such expressions are not actionable as against a seller, they are certainly not actionable against some third party, who made such statements after the purchase agreement was already executed.

As the Fourth Circuit has noted, reliance on "booster statements" of "enthusiastic agents" is unreasonable because such statements "are to be expected."  See Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 603 (4th Cir. 2005) (citation omitted) (Wilkinson, C.J., concurring in part and dissenting in part).  The Plaintiffs contend that Johnson's statements are distinguishable because her statements were made not in course of promoting of the Bank's loan products but rather were made in course of promoting the *developer's* product, that is, the Grey Rock development, and that she made such statements with "seeming objectivity."  [Doc. 46 at 19].  At bottom, however, Johnson was engaged in the marketing of one thing: the Bank's financial services. That she appeared to affirm and approve of the Plaintiffs' *prior* decision to purchase in Grey Rock does not change this fact.

Further, it was unreasonable for the Plaintiffs to rely on Johnson's opinions when the Purchase Agreement expressly warned the Plaintiffs:

**Disclaimer:** Seller and Purchaser acknowledge that they have not relied upon the advice or representation, if any, of Broker (or Broker's associated salespersons) relative to any consequences of this agreement and the sale of the Property, the purchase and ownership of the Property, the condition of the Property, the availability of utilities to the Property, or the investment potential or resale value of the Property. Seller and Purchaser both acknowledge that if such matters are of concern to them, they have sought and obtained independent advice. Purchaser acknowledges that Broker (or Broker's associated salespersons) are representatives of the Seller and are not acting by or for Purchaser in any capacity).

[See, e.g., Purchase Agreement, Doc. 44-6 at ¶ 25].

Finally, the Plaintiffs' claim of reliance is unjustified because they had ample opportunity to conduct an independent investigation of the property and reach their own conclusions about the development and its risks prior to purchasing the property but failed to do so. As the North Carolina Court of Appeals has explained:

In cases involving the purchase of real property, "[r]eliance is not reasonable if a plaintiff fails to make any independent investigation" unless the plaintiff can demonstrate: (1) "it was denied the opportunity to investigate the property," (2) it "could not discover the truth about the property's condition by exercise of reasonable diligence," or (3) "it was induced to forego additional investigation by the defendant's misrepresentations."

<u>Sunset Beach Dev., LLC v. AMEC, Inc.</u>, 196 N.C. App. 202, 209, 675 S.E.2d 46, 52 (2009) (quoting <u>RD & J Properties v. Lauralea–Dilton Enters., LLC</u>, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004)).  Here, the parties were engaged in an arm's length transaction.  The Plaintiffs were sophisticated investors, seeking to "flip" the property in a relatively short period of time for a profit.  Significantly, the Plaintiffs have not presented a forecast of evidence to suggest that the Bank denied them the opportunity to inspect the property or that they were otherwise induced to forego additional investigation as a result of Johnson's representations.

In this respect, this case is easily distinguishable from <u>Phelps-Dickson Builders, L.L.C. v. Amerimann Partners</u>, 172 N.C. App. 427, 617 S.E.2d 664 (2005), a case relied on by the Plaintiffs.  In that case, the plaintiff, a builder, entered into a contract with the defendant, a developer, to buy lots and build model homes based on the developer's representations about there being solid contracts to purchase lots in the subdivision, presales, and eager buyers.  <u>Id.</u> at 429, 617 S.E.2d at 666. When those representations turned out to be false, the builder sued, asserting, among other things, claims of fraud and unfair and deceptive trade practices.  <u>Id.</u> at 432, 617 S.E.2d at 667. The trial court granted the developer summary judgment, but the Court of Appeals reversed.  In so

holding, the Court of Appeals concluded that there was a genuine issue of fact as to whether the builder's reliance was reasonable because the builder had an inferior opportunity to investigate the developer's representations as that information was exclusively in the control of the developer and could not otherwise be readily or easily verified. Id. at 437-39, 617 S.E.2d at 670-71.

By contrast, in the present case, the Plaintiffs have failed to present any forecast of evidence to establish that the Bank held any superior knowledge regarding the wisdom of investing in the undeveloped lots in Grey Rock. Moreover, the Plaintiffs have failed to present anything to indicate that information regarding the development was exclusively in the control of the Bank and could not have been readily verified by the Plaintiffs. Indeed, the Plaintiffs had many means available to them to assess the value and condition of the property at issue, including independent appraisals, comparable sales data, and personal inspections of the property. The Plaintiffs, however, chose to forego any independent investigation of their investment prior to purchase. Under these circumstances, the Bank cannot be held liable for the Plaintiffs' failure to conduct their own due diligence.

Further, the Plaintiffs' asserted reliance was unjustified because their relationship with the Bank was contractual and did not give rise to a fiduciary duty to ensure that the Plaintiffs were making a sound investment. See In re Fifth Third Bank, Nat'l Ass'n–Village of Penland Litig., 217 N.C. App. 199, 212, 719 S.E.2d 171, 180 (N.C. Ct. App. 2011) (noting that borrowers "cited no authority tending to establish that [the lender] had a legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to [the borrowers] the results of any such investigation or any other deficiencies associated with the [development]."), cert. denied, 731 S.E.2d 687 (2012); Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party").[4]

For all of these reasons, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' fraud claim.

### D.    Chapter 75 Claim

---

[4] To the extent that the Plaintiffs base their fraud claim on the Bank's use of allegedly inflated appraisals, the Plaintiffs have not presented any forecast of evidence to suggest that the Bank had any knowledge that the appraisals were incorrect or false in any way. Moreover, the Plaintiffs have offered no forecast of evidence that they relied on these appraisals in purchasing their property. Indeed, neither of the Plaintiffs even saw an appraisal before entering into the purchase agreement.

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." Id. at 461, 400 S.E.2d at 482.

To the extent that the Plaintiffs' Chapter 75 claim is derivative of their claims for fraud and violations of the ILSA, such claim also fails for the reasons set forth above. See SilverDeer, LLC v. Berton, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (citing Governor's Club, Inc. v. Governors Club Ltd. P'ship, 152 N.C. App. 240, 255, 567 S.E.2d 781 (2002)).

The Plaintiffs contend that the Bank violated Chapter 75 by "align[ing] itself with the developer, promoting Grey Rock as an investment, and creating loan programs around it." [Doc. 46 at 21]. The Plaintiffs' assertions that the Bank should be held liable for its close association with Land Resource, however, are insufficient to state a claim under Chapter 75 absent a forecast of evidence that the Bank was an actual or apparent

27

agent of the developer.  See <u>In re Fifth Third Bank</u>, 217 N.C. App. at 211-12, 719 S.E.2d at 179-80 (dismissing Chapter 75 claim based on allegations that lender "gave an air of legitimacy to the Penland development by virtue of its involvement in the developers' lot sales program" and that lender clearly "had an agreement or working relationship with the developers with respect to the Penland lot loans.").

The Plaintiffs appear to have abandoned their Chapter 75 claim to the extent that such claim was based on a theory that the use of inflated appraisals by the Bank as part of its loan underwriting process constitutes an unfair or deceptive trade practice.  Even if the Plaintiffs were to pursue this theory, however, their claims would nevertheless be subject to dismissal as the undisputed forecast of evidence demonstrates that the Plaintiffs' Purchase Agreement was not dependent on the property appraising for any particular value or even any such appraisal being prepared.  It was the bank that required the appraisal for its underwriting purposes.  As such, the Plaintiffs could not have reasonably relied on the appraisal in proceeding with their lot purchase.  See <u>In re Fifth Third Bank</u>, 217 N.C. App. at 211, 719 S.E.2d at 179 ("Thus, given the complete absence of any evidence tending to show a causal connection between the allegedly defective appraisals and the injury that Plaintiffs claim to have

suffered, we conclude that the allegedly defective appraisals do not support a finding of liability pursuant to [Chapter 75].").

Finally, the Plaintiffs cannot establish an unfair or deceptive act based on the Bank's ostensible failure to prevent them from finalizing their lot purchases during the origination and underwriting process.  The Bank's role in this transaction was to provide financing; it had no contractual duties to the Plaintiffs outside of that role.  See Camp, 133 N.C. App. at 560, 515 S.E.2d at 913.  The Bank had no obligation to advise the Plaintiffs regarding the quality of the investment for which they sought financing. See In re Fifth Third Bank, 217 N.C. App. at 213, 719 S.E.2d at 180 (noting that lender has no "legal duty to investigate and monitor the activities of the developers and the progress of the development or to communicate to Plaintiffs . . . any other deficiencies associated with the [development]").[5]

In sum, the Plaintiffs have not presented any forecast of evidence establishing that the Bank committed any unfair or deceptive action during the Plaintiffs' lot purchase.  Accordingly, the Court concludes that the Bank is entitled to summary judgment on the Plaintiffs' claim under Chapter 75.

---

[5] Because the Court concludes that the Plaintiffs' Chapter 75 claim should be dismissed on the merits, the Court need not address the Bank's argument that the Plaintiffs' place of residence outside of the State of North Carolina precludes their recovery under Chapter 75.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine disputes of any material fact and that the Defendant is entitled to judgment as a matter of law.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 44] is **GRANTED**, and this action is hereby **DISMISSED**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Martin Reidinger
United States District Judge